PD-1122-15

PD-1122-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 8/27/2015 10:25:19 PM
Accepted 8/28/2015 1:18:07 PM
ABEL ACOSTA
CLERK

NO. _____

IN THE

# COURT OF CRIMINAL APPEALS

**OF TEXAS
AUSTIN, TEXAS**

## THE STATE OF TEXAS,
**Appellant**

v.

## TERRANCE GERMAINE WILKINS,
**Appellee**

## *APPELLEE'S
PETITION FOR DISCRETIONARY REVIEW*

**NO. 05-14-01365-CR
COURT OF APPEALS
FOR THE FIFTH DISTRICT OF TEXAS
AT DALLAS**

**On appeal from Cause Number F10-62224-X
in the Criminal District Court No. 6 of Dallas County, Texas
The Honorable Janine Howard, Judge Presiding**

**JOHN TATUM**
**Attorney for Appellant**
**990 S. Sherman Street**
**Richardson, Texas 75081**
**(972) 705-9200**
**jtatumlaw@gmail.conm**
**BAR NO. 19672500**

FILED IN
COURT OF CRIMINAL APPEALS

August 28, 2015

ABEL ACOSTA, CLERK

## IDENTITIES OF PARTIES AND COUNSEL

1.   The **Honorable Janine Howard**, Judge Presiding  of the Criminal District Court No. 6 of Dallas County presided over the jury trial.

2.   The State of Texas, represented by Assistant Criminal District Attorneys:

   **Michael R. Casillas**
   SBOT# 03967500
   **Josh Healey**
   SBOT# 24026288
   **Jeff Matovich**
   SBOT# 24043474
   Frank Crowley Courts Building
   133 N. Riverfront Blvd. LB 19
   Dallas, Texas 75207-4399

3.   Defendant, **Terrance Germaine Wilkins**, represented by:

   **Lalon "Clipper Peale** (Lead trial Counsel)
   SBOT# 15680400
   901 Main Street 6300
   Dallas, Texas 75207-4399

   **John Tatum** (Appellate Counsel/ Co-counsel at trial)
   SBOT# 19672500
   990 S. Sherman St.
   Richardson, Texas 75081

# TABLE OF CONTENTS

PAGE

IDENTITIES OF PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . 1

STATEMENT OF CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

STATEMENT OF THE PROCEDURAL HISTORY.. . . . . . . . . . 3

**GROUNDS FOR REVIEW**

**1.  The Court of Appeals erred in applying the law concerning reviewing the evidence to determine if the evidence was sufficient to support the conviction of Applicant for the offense of capital murder.**

**2. The Court of Appeals erred in finding that the trial court did not abuse its discretion by denying the request for a mistrial or instruction to the jury after the State failed to inform the defense in a timely manner of new 'Brady' information.**

**3. The Court of Appeals erred in finding that the trial court did not err in denying Appellant's request for a mistrial after evidence was not turned over to the defense prior to trial.**

**4. The Court of Appeals erred in finding that the trial court did not err in denying Applicant's motion for mistrial when the prosecutor gave a personal opinion during jury argument.**

REASONS FOR REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF FACTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-19

PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CERTIFICATES OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CERTIFICATE OF WORD COUNT . . . . . . . . . . . . . . . . . . . . . . . . . 21

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . 22

ADDENDUM A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# INDEX OF AUTHORITIES

FEDERAL CASES:

***Brady v. Maryland***
*373 U.S. 83 S.Ct. (1963).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-12,14-15

***Kyles v. Whitley***
115 S.Ct. 1555 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

STATE CASES

***Clayton v. State***
502 S.W. 755 (Tex. Cr,. App.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

***Herrin v. State***
125 S.W.3d 436 (Tex. Crim. App. 2002).. . . . . . . . . . . . . . . . . . . . . . . . . 10

***Menefee v. State***
614 S.W.2d 167 (Tex. Cr. App.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

***Puckett v. State***
168 Tex. Cr. R. 615, 33000 S.W.2d 465. . . . . . . . . . . . . . . . . . . . . . . . . . 18

***Robillard v. State***
641 S.W.2d 910 (Tex. Crim. App. 1982).. . . . . . . . . . . . . . . . . . . . . . . . . 18

STATUTES, RULES, CONSTITUTIONS:


14TH AMENDMENT U.S. CONSTITUTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# NO. 05-14-01365-CR

## TO THE COURT OF CRIMINAL APPEALS
## OF THE STATE OF TEXAS

**THE STATE OF TEXAS,**                                **Appellant**

**v.**

**TERRANCE GERMAINE WILKINS**               **Appellee**

***** 

## DEFENDANT'S/APPELLANT'S PETITION
## FOR DISCRETIONARY REVIEW

***** 

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

Comes now the Petitioner, by and through his attorney John Tatum, and respectfully urge the Court to grant discretionary review of the above named cause.

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner does not request oral argument at this time.

## STATEMENT OF CASE

Terrance Germaine Wilkins, Petitioner, was indicted for capital murder. The State did not seek the imposition of the death sentence. Petitioner entered a not guilty plea, but was convicted by the jury and automatically sentenced to imprisonment for life without the possibility of parole.

1

Petitioner subsequently filed a motion for new trial that claimed that newly-discovered/newly-available evidence was available while the jury was deliberating guilt/innocence. Petitioner's claim was based on the results of DNA testing of fingernail clippings that had ben taken from the complainant during the autopsy process, but not tested for DNA to see if Petitioner or another person's DNA was present on the complainant's fingernails which may have indicated another person as the victim's assailant.

The trial court granted Petitioner's motion for new trial. The State of Texas filed notice of appeal to the Court of Appeals - Fifth District at Dallas, Texas.

The sole issue raised at the time by the State of Texas was a question of whether the trial court erred in granting the defense's motion for new trial in relation to the facts as they relate to the DNA testing of fingernail clippings. The Court of Appeals reversed the trial court's granting of the motion for new trial, which reinstated the judgement of conviction to which Petitioner gave timely notice of appeal. The Court of Appeals affirmed the judgment of the trial court necessitating the filing of this petition.

## STATEMENT OF PROCEDURAL HISTORY

The Court of Appeals affirmed the trial court's judgment of conviction  in an opinion delivered on delivered August 4, 2015 a copy of which is attached hereto as Appendix A. Petitioner now files his Petition for Discretionary Review to this Honorable Court.

## GROUNDS FOR REVIEW RESTATED

**1.  The Court of Appeals erred in applying the law concerning reviewing the evidence to determine if the evidence was sufficient to support the conviction of Applicant for the offense of capital murder.**

**2. The Court of Appeals erred in finding that the trial court did not abuse its discretion by denying the request for a mistrial or instruction to the jury after the State failed to inform the defense in a timely manner of new 'Brady' information.**

**3. The Court of Appeals erred in finding that the trial court did not err in denying Appellant's request for a mistrial after evidence was not turned over to the defense prior to trial.**

**4. The Court of Appeals erred in finding that the trial court did not err in denying Applicant's motion for mistrial when the prosecutor gave a personal opinion during jury argument.**

## REASONS FOR REVIEW

This Court should review this issue because the Court of Appeals has so far departed from the accepted and usual course of judicial proceedings, or so

far sanctioned such a departure by a lower court, as to call for an exercise of the Court of Criminal Appeals' power of supervision.

## SUMMARY OF THE STATEMENT OF FACTS

Petitioner was tried for capital murder in the shooting death of Carlon Hellner, a drug user and dealer who sold drugs out of his apartment. See Court of Appeals opinion setting out a summary of the testimony.

## ISSUE NO. 1

**1. The Court of Appeals erred in applying the law concerning reviewing the evidence to determine if the evidence was sufficient to support the conviction of Applicant for the offense of capital murder.**

The Court of Appeals held that a reasonable jury could conclude beyond a reasonable doubt that Petitioner committed the charged offense. Petitioner submits that a rational jury as trier of fact in the case at bar could not have found all of the essential elements of the offense of capital murder beyond a reasonable doubt.

Petitioner argues that the State failed to present sufficient evidence to support the conviction for capital murder. The detectives in this case took the story of Sarah Malesky, the State's main witness, told them as the truth and never investigated the case any further. The detectives assumed she was telling the truth and never treated her as a suspect. They never looked into the victim's criminal

4

background. From the start of the investigation, Mr. Wilkins was the sole suspect, even though the victim and Ms. Malesky were drug dealers and drug users who lived in a 'trap' house where drugs were sold. The police did not investigate the people living in the next door apartment where drugs were sold. (RR: Vol. 4 p. 93)

When the detectives arrived at the scene, Ms. Malesky was present, using her cell phone. (RR: Vol. 3 p. 88) Neither her hands nor her clothing were tested for gunshot residue as she was not treated as a possible suspect at the scene of the offense. (RR: Vol. 3 p. 88,99-100) Nothing in her bedroom was examined for fingerprints. The baggies of marijuana were not tested for fingerprints. (RR: Vol. 3 p. 89) Detective Vick did not confiscate Ms. Malesky's cell phone or examine it for phone calls or text messages. (RR: Vol. 3 p. 88) The Detective also let Ms. Malesky retain possession of the victim's cell phone until 1:00 a.m. the next morning after the 911 call and download information from it. (RR: Vol. 3 p. 210) Detective Quirk never asked her for a list of her drug customers. (RR: Vol. 3 p. 211)

There is no physical evidence that ties Mr. Wilkins to the scene at the exact time of the deceased was shot and killed. Detective Vick testified that there were no latent prints at the scene. (RR: Vol. 3 p. 63) Detective Quirk testified that

5

there was no DNA, fingerprints, gunshot residue or any other physical evidence that ties Mr. Wilkins to the offense. (RR: Vol. 4 p. 78-79) The only gunshot residue evidence was found on the hand of Ms. Malesky taken at the police station a few hours after the shooting.  (RR: Vol. 3 p. 201) They never asked Ms. Malesky if she owned a gun.  (RR: Vol. 4 p. 78)  The only evidence Detective Quirk had when he issued an arrest warrant for the Defendant was the statement of Ms. Malesky.  (RR: Vol. 4 p. 86)

Petitioner argued that the only evidence of an alleged robbery or attempted robbery and murder presented by the State comes from the testimony of a person who admittedly used drugs that night, who sold drugs out of her apartment, who continually changed her story, who was more concerned about concealing her marijuana than getting help for her friend, who accused the Defendant of stealing $500, her purse and medication only to have it later miraculously turn up.  She was the only person who had gunshot residue on her hands, the only physical evidence tying anyone to the killing.

Detective Quirk never investigated Ms. Malesky's boyfriend, even though there was bad blood between him and Mr. Hellner. (RR: Vol. 3 p. 214) Ms. Malesky told him that Mr. Hellner had gone to the store to buy her 7-UP and cigarettes but the Detective did not verify this or her contention that she was sick

6

that night. (RR: Vol. 4 p. 97-98) The Detective testified that Ms. Malesky gave him three different versions of the events of that night. (RR: Vol. 4 p. 100) The detective never went to the next door apartment to determine if Ms. Malesky had ever smoked crack cocaine with the Defendant as he claimed. (RR: Vol. 4 p. 14)

Sarah Malesky testified that she and the victim sold drugs out of their apartment. (RR: Vol. 3 p. 136) The Defendant was her next door neighbor who sold them crack cocaine and cocaine out of his apartment. (RR: Vol. 3 p. 141) She testified that at the time of his death, Carlon Hellner had relapsed and was using crack cocaine. (RR: Vol. 3 p. 142) The medical examiner testified that Mr. Hellner had likely smoked or ingested cocaine several hours before he died. (RR: Vol. 4 p. 164-165) Appellant argues that he was called by Mr. Hellner and he went to the apartment and found him dead.

Ms. Malesky testified that she woke up to find the Defendant standing in her room, pointing a gun at her. (RR: Vol. 3 p. 150) She stated that she did not hear any gunshots that night. (RR: Vol. 3 p. 151) She told police that the Defendant wanted money and asked her where she kept the marijuana. (RR: Vol. 3 p. 152) She told him it was in the freezer and he looked inside before he forced her into the bathroom. (RR: Vol. 3 p. 156) She claims that he told her "sorry about her daddy, but he started tripping." (RR: Vol. 3 p. 156)

7

Ms. Malesky continually changed her story of the events of that night. She stated that she used the victim's cell phone to call 911 but there were no records of a 911 call on that phone. (RR: Vol. 3 p. 210) She told the Detectives that the Defendant took $500, her purse and her medication from her. (RR: Vol. 3 p. 216) When she made the 911 call, she mentioned that $500 had been taken from her. (RR: Vol. 3 p. 215) Detective Quirk testified that she never called him to tell him that she had recovered her missing property and found out just two weeks before trial that she had found the items. (RR: Vol. 4 p. 77) Ms. Malesky claimed exclusive ownership fo the marijuana. (RR: Vol. 4 p. 8-11) Ms. Malesky changed her story about knowing the Defendant from just seeing him around the apartment complex to the Defendant coming over to her apartment four or five times. (RR: Vol. 4 p. 122) She changed her story about her drug use the night of the incident. In her third version of the events, she told detectives that she had taken an overdose of Theraflu. (RR: Vol. 4 p. 103) Detective Quirk stated that she was very concerned about explaining why she hadn't heard any gunshots. (RR: Vol. 4 p. 104)

Detective Quirk testified that Mr. Wilkins never admitted he shot Carlon Hellner. (RR: Vol. 4 p. 46) Mr. Wilkins told detectives that he was in the apartment with a gun that night. He said the gun he had was a .38 and he later

8

sold it in South Dallas. (RR: Vol. 4 p. 64-65) The bullets that killed Mr. Hellner were fired from a .32 caliber gun. (RR: Vol.6 p. 31) He gave detectives details about where he sold the gun in South Dallas. (RR: Vol. 4 p. 65) Detectives went to the location, left a card and was later called by the family living there and told that they didn't know the Defendant. (RR: Vol. 4 p. 66)

The two statements made by Ms. Malesky that were corroborated by the Defendant were that he was in her apartment with a gun and he looked in the freezer. Appellant submits that he went to the apartment not wearing any disguise and was known by Ms. Malesky. If he was going over to that apartment to kill Mr. Hellner, he would have worn a disguise or also killed Ms. Malesky. It didn't make any sense for the Defendant to go into the apartment and shoot Mr. Hellner. Mr. Hellner was the customer who bought the Defendant's cocaine and provided him with a profit. The Defendant carried a gun for protection. Mr. Wilkins receives a phone call from Mr. Hellner, goes to the apartment to sell him some crack. He finds the apartment door opened and pulls out his gun. He went into Ms. Malesky's room and when she awakens and sees him, she begins to act crazy. He tells her that she's tripping and that she needs to check on her dad because he has to get out because he has drugs on him. The Defendant then fled the scene.

9

Petitioner further argued that the nothing was stolen or attempted to be stolen from the victim at the time of the murder. Ms. Malesky claimed that the Defendant stole $500, her purse and medication from her, but she later found these items. (RR: Vol. 3 p. 184) This fact was made known to the defense only during her in-court testimony. Ms. Malesky also claimed that the Defendant stole the change left on her bedside table by Mr. Hellner when he returned with the items he bought for her. (RR: Vol. 3 p. 151) There is no corroboration that anything was taken from the apartment by the Defendant causing this offense to be a capital offense pursuant to the indictment. The evidence was wholly insufficient to prove that the defendant caused the death of Carlon Heller by shooting him with a firearm in the course of committing or attempting to commit the offense of <u>aggravated robbery</u> of the <u>deceased</u>. See *Herrin v. State*, 125 S.W.3d 436 (Tex. Crim. App. 2002).

There is no showing that the defendant killed Carlon Heller or that he attempted or did commit the offense of aggravated robbery of the deceased as alleged in the indictment.

## ISSUE NO. 2

**2. The Court of Appeals erred in finding that the trial court did not abuse its discretion by denying the request for a mistrial or instruction to the jury after the State failed to inform the defense in a timely manner of new 'Brady' information.**

The State conceded in its brief on appeal that the information regarding the erroneous nature of the principal State's witness initial claims should have been provided to Petitioner's defense trial team more promptly. However, the State argued and the Court of Appeals held that the defense was able to put the information disclosed during trial to 'effective use' at trial. Petitioner submits that nothing could be further from the truth as he claims that he was prejudiced by the tardy disclosure and the trial court's denial of his request for a mistrial and or curative instruction to the jury.

Petitioner claimed that the trial court should have granted a mistrial since the State did not disclose that Sarah Malesky's allegedly stolen property was in fact recovered by her pursuant to their duty under 'Brady'. Trial counsel in a sub rosa hearing advised the court that he was making a motion for a mistrial, because during the testimony of Sarah Malesky he learned that the State had not advised or told him that the purse, drugs or $500 cash was not stolen as originally reported and continually reported in the offense reports and discovery made available to defense counsel by State's counsel. (RR: Vol. 4 p. 4) The witness had

11

told this information to the State (Detective and Prosecutor) at least a couple of weeks before trial and this exculpatory (Brady) information had not been turned over to the defense. Trial counsel stated that he believed this information was 'Brady' material and could be used for impeachment. (RR: Vol. 4 p. 6) Additionally, trial counsel learned for the first time at trial that the witness' medication, keys and purse were recovered. (RR: Vol. 4 p. 7)

Counsel argued that this information was crucial in trial preparation and voir dire of potential jurors, because he could have prepared for presenting the issue of a lessor included offense of murder in representing this Defendant. Trial Counsel argued that his preparation for trial was prejudiced and harmed by the lack of disclosure of this 'Brady' information. The trial court overruled defense counsel's request for a mistrial.

If the court was not going to grant a mistrial, defense counsel asked for a curative instruction since the prosecutor who conducted voir dire told the jury that the State had an open file policy as to the defense being able to have access to all information in the State's file, which was not in fact the case in this case. This voir dire left a false impression of the real state of the facts about disclosure with the jury. This false impression prejudiced Petitioner's right to a fair trial; thereby causing irreparable harm without the requested curative

12

instruction. (RR: Vol. 4 p. 22-23) The Court denied the motion for mistrial (RR: Vol. 4 p. 22) and for a curative instruction as requested (RR: Vol. 4 p. 33)

It is fundamental that a trial should be conducted and a verdict rendered under circumstances in which society may have confidence that the defendant received a fair trial and that justice was done.  Otherwise, the "system" fails.  And for the prosecution to fail to disclose to the defendant material exculpatory information compromises this confidence by "tainting" the fairness of the trial, and that failure should be "fundamental error of constitutional dimension and requires no objection" from defense counsel to preserve it for appellate review.  See *Brady v. Maryland,* 373 U.S. 83 (1963) and *Kyles v. Whitley,* 115 S.Ct. 1555 (1995).

## ISSUE NO. 3

**3. The Court of Appeals erred in finding that the trial court did not err in denying Appellant's request for a mistrial after evidence was not turned over to the defense prior to trial.**

At issue are the fingernail clippings taken from the deceased victim that were not tested for DNA until the end stage of the trial.  DNA tests ordered by the Court during the jury's deliberation on guilt/innocence showed that the deceased victim had biological material under his fingernails of his right hand that

13

did not belong to Petitioner or the State's principle witness who resided with the deceased.

It was discovered during trial that a potential crucial piece of evidence had not be 'DNA tested', at which there is an initial discussion of how to procedurally handle getting the fingernail clippings of the deceased tested for 'DNA' results during the progress of the trial and continuing or not with the trial in the guilt/innocence stage. Defense counsel reminded the trial judge that he had requested a mistrial, because of the failure to turn over to the defense contradictory evidence that was in the possession of the State prior to trial that the purse had been recovered, the keys had been recovered and the two things had been recovered. These items were originally reported stolen by the witness, Malesky. There was an order entered in May of 2011 that all of this type of "Brady' and impeachment information be turned over to the defense.

The record shows that at the conclusion of the prior days testimony of the medical examiner, Ms. Urban, there was an off the record discussions by the parties and the court about the lack of DNA testing on the fingernail clippings of the deceased and that it appeared to all concerned that the defendant was entitled to have these tests performed to see if there was exculpatory evidence that would aid in his defense. (RR: Vol. 5 p. 4-5) The State suggested after talking to its

14

appellate section that the trial proceed and the tests be conducted. If the results were favorable to the defendant then a motion for new trial could be granted (RR: Vol. 5 p. 5-17)

The parties and the Court agreed to have the fingernail clippings 'DNA' testified and to continue with the trial since the trial judge made arrangements to have the tests performed and results obtained within a couple of days. The State agreed that any beneficial evidence to the defendant which came out as a result of the DNA tests would be "basis for the motion for new trial " (RR: Vol. 5 p. 17) if the defendant was convicted. The State even acknowledged that if this was the case, the trial court would be inclined to grant a new trial if the test result was beneficial to the defendant. (RR: Vol. 5 p. 17) The defense then reurged a motion for mistrial. (RR: Vol. 5 p. 20-21) The court agreed to review the prosecutor's notes to determine if 'Brady' material was not turned over to the defense. (RR: Vol. 5 p. 23) The Court, after an 'in camera' examination, ruled that there was no 'Brady' material and denied the motion for mistrial. (RR: Vol. 5 p. 20)

Petitioner submits that in order that justice be done in this case and that he be provided proper 'due process' in this trial, the court should have granted a mistrial rather than put the defendant in the position of agreeing or not as

15

whether to continue the trial to jury deliberation as an expedient solution to a very serious question. This method as suggested by the State put the defendant in an untenable dilemma of agreeing to proceed to have the DNA tests on the finger nail clippings with the impression given by the State that if the results are favorable it would be the subject of a motion for new trial upon conviction and that the Court would grant such a motion without informing the defendant that the State would actually hotly contest the granting of a new trial to the point of appealing the trial court's granting the motion for new trial.

Petitioner submits that this error raised caused him egregious harm in that it deprived him a fair trial and or vitally affected a defensive theory. Petitioner argues that (1) the State should be estopped to deny the granting of the motion for new trial and (2) the defendant's agreement to continue the trial to accommodate the trial court was not freely and voluntarily made as it was induced under false pretenses that he would receive a new trial from the Court with favorable test results which were in fact obtained.

The DNA results on the fingernail clippings shows that the alleged victim in this case, Carlon Hellner, had biological material under his right hand fingernails that belongs to some third person that is not the defendant or belong to the principal prosecution witness, Sarah Malesky, who was present at the time of

16

alleged offense. The Defense theory of the case that the victim was killed buy some other third party, who was present at the scene, while the witness Malesky was asleep in a drugged state of mind that prevented her from hearing the gunshots that killed the deceased. The trial court ordered that a DNA analysis be performed immediately by the Southwestern Institute for Forensic Sciences at Dallas, while the trial progressed. On the day the jury returned a verdict of guilty the trial court received the court ordered report that confirmed that the right hand fingernail sample of the victim contained DNA from a third as of now unidentified person, that could indicate that this biological material could have been deposited under the fingernail in any form of struggle or physical confrontation between the victim and another as an assailant in this case.

Petitioner submits that this error, whether fundamental or otherwise has caused egregious harm in the administration of justice in this case. The State should not be allowed to unduly suggest and to induce acceptance of its proposal to continue the trial to verdict rather than recess the trial in anticipation of the forensic test results and then vigorously fight the granting of a motion for new trial where the tests results were arguably favorable to the defense. This practice in this case resulted in a fundamentally unfair trial for the defendant; which violated his right to due process. 14th Amendment to the United States Constitution.

# ISSUE NO. 4

**4. The Court of Appeals erred in finding that the trial court did not err in denying Petitioner's motion for mistrial when the prosecutor gave a personal opinion during jury argument.**

Petitioner submits that it was an intentional act of the prosecutor to give an impermissible personal opinion about the strategy and handling of the defendant's sister as a witness. This was intended to prejudice Petitioner before the jury and deny him a fairer trial by trying to bolster the effect of that witness's testimony. This conduct is prohibited and results in harm to a defendant's right to due process and a fair trial. *See Robillard v. State*, 641 S.W.2d 910 (Tex. Crim. App. 1982).

Each attorney has a right to explain certain evidentiary problems, issue and circumstances in a case. In the present case the prosecutor attempted to explain why the State sought to introduce only a portion of Petitioner's written statement. In so doing the prosecutor chose to attach a personal belief to a portion of the evidence before the jury. The effect of such a statement bolstered the credibility of the portion of Petitoner's written statement introduced by the State. Such a statement by the prosecution taken in context is an improper expression of personal opinion and constitutes reversible error. *Puckett v. State*, 168 Tex. Cr. R. 615, 33000 S.W.2d 465; *Clayton v. State*, 502 S.W. 755 (Tex. Cr,. App.); *Menefee*

18

*v. State*, 614 S.W.2d 167 (Tex. Cr. App.)  The Court of Appeals did not properly apply a balancing test of factors to the prosecutor's argument to determine if reversible error existed.

## PRAYER

For the reasons stated, it is respectfully submitted that the Court of Criminal Appeals should review the grounds of error on Petition for Discretionary Review then reverse the judgment, set aside the conviction of Petitioner and dismiss the case, or, in the alternative, grant Petitioner a new trial.

Respectfully submitted,


   /s/   John Tatum

John Tatum
990 S. Sherman St.
Richardson, Texas 75081
(972) 705-9200
State Bar No. 19672500

`

## CERTIFICATE OF SERVICE

I hereby certify, by affixing my signature above, that a true and correct copy of the foregoing *Petition for Discretionary Review*, was delivered to Susan Hawk, Criminal District Attorney, Appellate Section, 11th floor, Frank Crowley Criminal Courts Building, Dallas, Texas 75207, on this 27th day of August, 2015.

       /s/ John Tatum
       JOHN TATUM


## CERTIFICATE OF SERVICE

The undersigned attorney for Petitioner certifies that a true and correct copy of the foregoing brief was mailed , postage prepaid, to Petitioner, Terrance Germaine Wilkins, TDCJ# 01962197 at the Stiles Unit, 3060 FM 3514, Beaumont, Texas 77705 by U.S. Mail this the 27th day of August, 2015.

       /s/ John Tatum
       JOHN TATUM

**CERTIFICATE OF COMPLIANCE OF WORD COUNT PURSUANT TO APPELLATE RULE OF PROCEDURE 9.4**

I certify that this document has 4,175 words pursuant to the definitions of length and content in Rule 9.4. (C)(i)(2)(D)

A. Case Name: Terrance Wilkins
B. The Court of Criminal Appeals
C. The Type of Document: Petition for Discretionary Review
D. Party for whom the document is being submitted: Appellant
E. The Word Processing Software and Version Used to Prepare the Brief: Word Perfect X7
Copies have been sent to all parties associated with this case.

 /s/ John Tatum    8 / 27 /2015
(Signature of filing party and date)

## CERTIFICATE OF COMPLIANCE

I certify that this submitted e-mail attachment to file Petition for Discretionary Review complies with the following requirements of the Court:

1. The petition is submitted by e-mail attachment;

2. The e-mail attachment is labeled with the following information:


A. Case Name: Terrance Wilkens
B. The Appellate Case Number: NO. 05-14-01365-CR
C. The Type of Document: Petition for Discretionary Review
D. Party for whom the document is being submitted: Petitioner
E. The Word Processing Software and Version Used to Prepare the Motion : Word Perfect X7

3. Copies have been sent to all parties associated with this case.

   /s/ John Tatum                                      8/27/15
(Signature of filing party and date)

John Tatum
(Printed name)

John Tatum, Attorney at Law

Emailed Copy of Petition

22

ADDENDUM



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-14-01365-CR

**TERRANCE GERMAINE WILKINS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 6**
**Dallas County, Texas**
**Trial Court Cause No. F10-62224-X**

## MEMORANDUM OPINION

Before Justices Fillmore, Myers, and Evans
Opinion by Justice Myers

A jury convicted appellant Terrance Germaine Wilkins of the capital murder of Carlon Hellner, and the trial court imposed an automatic sentence of life imprisonment without the possibility of parole.[1] In twelve issues, appellant challenges the sufficiency of the evidence, the denial of various motions for mistrial, and several rulings on evidentiary issues. As modified, we affirm the trial court's judgment.

### BACKGROUND AND PROCEDURAL HISTORY

Sarah Malesky testified that she and the decedent, Carlon Hellner, lived together in the apartment where Hellner's body was found. She had known him for five years and lived with him for four months before he was killed. Malesky described her relationship with Hellner as a

---

[1] The State did not seek the death penalty.

"father-daughter" type of relationship. Malesky admitted she and Hellner sold marijuana out of the apartment. Hellner drove for Malesky, took phone calls for her, and protected her.

The apartment next door was a "trap" house where illegal narcotics were sold. Appellant—Malesky and Hellner called him "Youngster"—sold crack and cocaine out of this apartment. Malesky had known appellant for approximately a month at the time of these events. Appellant sold some crack cocaine to Hellner before his death. Hellner had attempted to quit his crack habit and was clean for six years, but he relapsed and began using crack again in October 2010, around the time the trap house opened. A man named "Shorty" or "Nate" ran the trap house; appellant worked for him.

Malesky said that appellant had been in the apartment with her once. Malesky did not know if appellant spent a lot of time in the apartment with Hellner when she was not there. She said Hellner would give appellant rides to another apartment complex, and appellant would pay him with a "nickel" rock (five dollars' worth) of crack. Malesky had also given appellant a ride in her car at least once. According to Malesky, Hellner would get upset because appellant "was showing up and knocking on the door a lot."

Malesky testified that on October 26, 2010, she was ill with a fever, sore throat, and coughing. She and Hellner always locked their front door and it was locked on this occasion. She took twice the recommended dose of Theraflu, smoked some marijuana, and took Xanax. At around 6:00 p.m., she went to sleep with the lights on in her bedroom. She awakened to find appellant standing over her pointing a gun at her. He did not wear a mask or try to hide his identity. Appellant demanded money and marijuana and picked up some change she had on her table. He asked Malesky where her stash was, and led her out into the living room. Malesky told appellant there might be some marijuana in the freezer. When he walked to the refrigerator, she tried to run, but appellant caught her by the arm and told her to stop playing. He forced her

–2–

into the bathroom, and as he was closing her door he looked Malesky "right in [her] eyes" and said, "Sarah, I am sorry about what happen [sic] to your daddy, but he started tripping." Appellant then shut the door.

When she thought it was safe, Malesky picked up a knife and went to check on Hellner. She could not get into Hellner's room because the closet door was falling over and barricading the door to the bedroom. She pushed the door open and saw Hellner lying on the floor. She shook him by his left shoulder and touched his neck but felt no pulse. When she saw he was not breathing, Malesky pulled a cell phone out of Hellner's pants pocket and called 911. After she called 911, she took the marijuana that was hidden under Hellner's mattress and put it in her bedroom. Malesky said she did not see Hellner get shot.

Dallas Police Officer Timothy Gilliam was the first officer to arrive at the scene. He knocked on the door of the apartment in question, and the door was opened by Malesky. Malesky was frantic, crying, and appeared to be in a state of shock.

Malesky led the officer to a bedroom. The door was partially open, but there was an object in front of the door that prevented it from being opened completely. When the paramedics pushed the object away, the officer saw Hellner lying on the floor between the bed and a chair. He appeared to have been shot. The paramedics subsequently told the officer they were unable to resuscitate Hellner and believed he was dead.

Detective Will Vick was dispatched to the apartment, where he met with Malesky and the patrol officers. Detective Vick observed that there was no forced entry into the apartment. As he did an initial walk-through of the apartment, Detective Vick noticed that the freezer door was open, a closet door was off of its hinges, and a chair was knocked over. A glass table near Hellner's bed had been knocked askew, and held a crack pipe and a "drug baggie." There was a knife on the nightstand by the bed in Malesky's bedroom. Several "baggies" of marijuana, an

–3–

aluminum container, a digital scale, and a grinder were found in her bedroom closet. Detective Vick also found two empty prescription bottles, for hydrocodone and Alprazolam, in Malesky's bedroom. No firearms, bullets or other ammunition were found in the apartment. There were no blood spatters, blood stains, or latent fingerprints found in the apartment.

Malesky admitted that when she talked with the detectives she tried to cover up the drug activity and did not tell them she was selling and using drugs. Although she initially told the police that $500, her purse (containing her keys), and prescription medications (hydrocodone and Xanax) were missing from the apartment, she subsequently found everything she had reported missing. In her interview with the police, Malesky said she knew nothing about the marijuana that the police found in the apartment and that it must have belonged to Hellner. When she testified, however, she admitted that she bought a pound of marijuana for about $450 a week before the incident. Malesky recalled telling the detective that Hellner must have let appellant into the apartment and that maybe they had been fighting about money or "dope."

Malesky was tested for gunshot residue at the police station. A trace evidence examiner testified that she examined the gunshot residue kit and found two primer gunshot residue particles on the back of Malesky's right hand. The examiner was unable to offer an opinion as to where the particles came from and how they were transferred.

Dr. Jill Urban, a forensic pathologist, testified about the autopsy that was performed on Hellner. There were two gunshot wounds to Hellner's right shoulder, with no exit wounds. The gunshot wounds resulted from a contact or close range shot, and it was difficult to determine if there had been a struggle. The toxicology report showed no cocaine present but Hellner's blood contained cocaine metabolites. Dr. Urban explained that the presence of cocaine metabolites indicated it was likely Hellner had smoked or ingested cocaine several hours before he died. Although the EMS crew was able to get an "electrically measured heart rhythm" while Hellner

–4–

was being transported to the hospital, he was not breathing and had no detectable pulse or respirations when he arrived at the hospital. Dr. Urban testified that an individual who sustained injuries like Hellner's would be unlikely to survive more than a half hour, and probably "considerably less." Hellner had a normal body temperature when he arrived at the hospital, which, according to Dr. Urban, indicated that the wounds were likely sustained within minutes of his receiving EMS treatment. Dr. Urban further testified that a "head hair standard" and fingernail clippings from the left and right hands were taken from Hellner. She also testified, however, that when signing the final autopsy report she did not see any results from the crime lab for the fingernail clippings and did not think they were examined.

A trace evidence examiner testified that she examined Hellner's clothing and found two holes in the right front shoulder of his t-shirt. The examiner testified that there was a nitrate reaction, lead wipe, and vaporous lead reaction near the sites, indicating that the shots were within an eighteen to twenty-four inch range. A trace evidence supervisor testified he examined the gunshot residue test performed on Hellner and that the test showed gunshot residue particles on the back of Hellner's right hand.

Appellant was aware the police were looking for him. He was arrested on the afternoon of November 15, 2010, twenty days after the offense, and was interviewed that day by Dallas Police Detective Robert Quirk. During the interview, which was videotaped and introduced at appellant's trial, appellant told Detective Quirk Hellner had called him and that he was in the apartment that night to deliver drugs to Hellner. He admitted to waking up Malesky with a gun in his hand and looking for drugs in the freezer. Appellant said that he did not remain in the apartment because he had drugs on him and wanted to get rid of them that night. Appellant described his gun as a .380 pistol and said he later sold it. Appellant repeatedly denied shooting Hellner. He claimed to have found Hellner on the floor in his bedroom when he arrived at the

apartment. Detective Quirk also testified that there was no DNA, gunshot residue, fingerprint, or other physical evidence linking appellant to the offense.

Heather Thomas, a firearm and tool mark examiner for the Dallas County Crime lab, testified about the bullets that were fired and examined as evidence. Thomas stated that there were two bullets, fired by the same gun, consistent with a .32 caliber revolver.

The day after the medical examiner testified about the autopsy and the fact that the fingernail clippings taken from Hellner had not been tested, there was discussion among counsel and the court about several evidentiary matters including the fact that the fingernail clippings had not been tested. After discussing whether to test the clippings, the parties agreed that the trial should continue while the tests were being performed. Those test results, which were reported to the court while the jury was deliberating its verdict, showed Hellner had biological material under the fingernails of his right hand that did not belong to appellant or Malesky.

Appellant was convicted by the jury and sentenced to imprisonment for life without the possibility of parole. He subsequently filed a motion for new trial that argued newly-discovered or newly-available evidence based on the results of the DNA testing of the fingernail clippings that had been taken from Hellner during the autopsy. The trial court granted appellant's motion for new trial. We vacated the trial court's order granting a new trial and reinstated the guilty verdict. *See State v. Wilkins*, No. 05–12–00154–CR, 2014 WL 465820, at *8 (Tex. App.—Dallas February 4, 2014, pet. ref'd) (not designated for publication). Appellant now pursues the direct appeal of his criminal conviction.

DISCUSSION

## I. Sufficiency of the Evidence

In his first issue, appellant argues the evidence is insufficient to support the conviction. We review appellant's sufficiency challenge by considering all the evidence in the light most

–6–

favorable to the verdict; based on that evidence and any reasonable inferences, we must determine whether a rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014). Under this standard, the fact finder has full responsibility for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. We presume that the fact finder resolved any conflicts in the evidence in favor of the verdict and defer to that determination. *See id*. at 326. We do not reassess witness credibility. *Thornton*, 425 S.W.3d at 303.

The indictment in this case alleged appellant committed capital murder by having shot and killed Carlon Hellner in the course of committing and attempting to commit aggravated robbery. Shortly before the start of voir dire, the State abandoned the aggravated robbery allegation and elected to proceed on the theory that appellant committed capital murder in course of committing and attempting to commit robbery.

The penal code provides that a person commits capital murder if he commits murder in the course of committing or attempting to commit robbery. TEX. PENAL CODE ANN. § 19.03(a)(2). A person commits robbery "[i]f, in the course of committing theft . . . and with intent to obtain or maintain control of the property, he (1) intentionally, knowingly, or recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." *Id*. § 29.02(a). A person commits theft if he unlawfully appropriates property with the intent to deprive the owner of it. *Id*. § 31.03(a).

The court of criminal appeals has defined "in the course of committing" an offense as conduct occurring in an attempt to commit, during the commission of, or in the immediate flight after the attempt or commission of the robbery. *Lincecum v. State*, 736 S.W.2d 673, 680 (Tex.

–7–

Crim. App. 1987). When a person is charged with committing murder in the course of committing a robbery, "[e]vidence is sufficient to support a capital murder conviction if it shows an intent to obtain or maintain control of property which was formed before or contemporaneously with the murder." *Sheffield v. State*, 189 S.W.3d 782, 791 (Tex. Crim. App. 2006). The State does not have to prove "that the appellant completed the theft of the victim in order to establish the underlying offense of robbery or attempted robbery." *Young v. State*, 283 S.W.3d 854, 862 (Tex. Crim. App. 2009). Instead, if there is evidence from which the jury rationally could conclude beyond a reasonable doubt that the defendant formed the intent to obtain or maintain control of the victim's property either before or during the commission of the murder, then the State has proven that the murder occurred in the course of robbery. *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995). The jury may infer the requisite intent to rob from circumstantial evidence, including the conduct of the defendant. *Id*.; *see Young*, 283 S.W.3d at 862.

Appellant raises various arguments concerning why the evidence is insufficient to show he committed capital murder as charged in the indictment. He argues that the police accepted Malesky's story as true and never investigated the case further—failing to test Malesky's hands or clothing for gunshot residue at the crime scene, failing to examine her bedroom or the baggies of marijuana for fingerprints, and failing to confiscate Malesky's cell phone and examining it for calls and text messages. Appellant also points out there is no physical evidence—i.e., DNA, fingerprints, gunshot residue—tying him to the crime scene at the *exact* time Hellner was shot and killed. In addition, the only evidence of an alleged robbery or attempted robbery came from Malesky, who used drugs that night, sold drugs out of the apartment, changed her story of what happened, and "was more concerned about concealing her marijuana than getting help for her friend." Appellant further argues nothing was stolen or attempted to be stolen from the victim at

the time of the murder; Malesky reported the $500, her purse, and the medication as missing from the apartment, but she later found everything she had reported missing.

We find these arguments unconvincing. Although appellant repeatedly attacks Malesky's credibility as a witness, the jury was the ultimate judge of the weight and credibility of the evidence and was free to either accept or reject any or all evidence presented by either side. *See Sorto v. State*, 173 S.W.3d 469, 475 (Tex. Crim. App. 2005); *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). As for the adequacy or inadequacy of the investigation, Detective Quirk's testimony and appellant's recorded statement show that appellant admitted he was in the apartment that night. At first, appellant repeatedly denied having had a gun, but then, later in the interview, he admitted he was armed with a pistol. Appellant also admitted searching the freezer looking for marijuana, but he admitted this only after Detective Quirk asked appellant, in what the detective described as an interrogation tactic, what appellant would say if the police found appellant's fingerprints on the refrigerator or freezer. A rational trier of fact could consider such statements by appellant, in connection with the other circumstances of the case, as affirmative evidence of guilt. *See, e.g., Padilla v. State*, 326 S.W.3d 195, 201–02 (Tex. Crim. App. 2010. Moreover, appellant admitted there was "bad blood" between himself and Hellner, and that Hellner called him and he spoke to Hellner a short time before the victim's body was found. Appellant also admitted he ran from the police that night and that he knew the police were looking for him. It has long been recognized that a jury may infer guilt from the circumstance of flight. *See, e.g., Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (citing *Hardesty v. State*, 656 S.W.2d 73, 78 (Tex. Crim. App. 1983)).

Additionally, while Hellner's time of death could not be pinpointed, Dr. Urban, the forensic pathologist, testified that he had a normal body temperature, 98.9 degrees Fahrenheit, at 9:57 p.m., shortly after he arrived at the hospital—at a point when Hellner had no blood pressure,

–9–

pulse, or respirations. Dr. Urban added that the wounds were likely sustained minutes before Hellner was treated by emergency medical personnel, and that his body temperature would have been lower than 98.9 degrees if more than an hour had passed since he died. Together with the other circumstances of this case, the jury could reasonably determine from such evidence that appellant was at the crime scene when Hellner was shot and killed. As for the argument that the record does not show appellant took or attempted to take any property, the State was not required to prove appellant completed the theft in order to establish the underlying offense of robbery or attempted robbery. *See Young*, 283 S.W.3d at 862. Malesky testified that when she woke up appellant immediately began demanding money and marijuana. Other evidence showed that Malesky and Hellner sold marijuana out of the apartment together, that they did so the entire time Malesky was at the apartment, and that they shared the apartment. Appellant cites evidence indicating that the marijuana was Malesky's exclusive property, but the resolution of conflicts and inconsistencies in the evidence was the province of the trier of fact. *See Bowden v. State*, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982) (op. on reh'g).

It is not our role to act as a "thirteenth juror" and disregard, realign, or reweigh the evidence in this case. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988) (en banc). Our task is limited to determining whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. Viewing the evidence in the light most favorable to the verdict, we conclude a reasonable jury could conclude beyond a reasonable doubt that appellant committed the charged offense. We overrule appellant's first issue.

## II. Motions for Mistrial

### Second and Third Issues

In his second and third issues, appellant contends the trial court should have granted a

mistrial because the State did not disclose that Malesky's "allegedly stolen property," i.e., the $500, her purse (and its contents), and her medication, was in fact found, and that the State's failure to disclose this fact violated its obligations under *Brady*. *See Brady v. Maryland*, 373 U.S. 83 (1963). Appellant also faults the trial court for refusing to provide a curative instruction.

We review a trial court's denial of a motion for mistrial and refusal to give a curative instruction for an abuse of discretion. *Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004) (mistrial); *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999) (mistrial); *Berrera v. State*, 291 S.W.3d 515, 518 (Tex. App.—Amarillo 2009, no pet.) (curative instruction). A mistrial is appropriate when error "is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Hawkins*, 135 S.W.3d at 77 (quoting *Ladd*, 3 S.W.3d at 567). "In effect, the trial court conducts an appellate function: determining whether improper conduct is so harmful that the case must be redone." *Id*. We uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010). "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Hawkins*, 135 S.W.3d at 77; *see also Ocon v. State*, 284 S.W.3d 880, 884–85 (Tex. Crim. App. 2009).

Pursuant to *Brady*, the State has an affirmative duty under the Due Process Clause of the Fourteenth Amendment to disclose evidence that is favorable to the defendant and is material to a defendant's guilt or punishment. *Thomas v. State*, 841 S.W.2d 399, 407 (Tex. Crim. App. 1992). To establish a *Brady* violation, a defendant must show: (1) the State failed to disclose evidence; (2) the withheld evidence was favorable to the defendant; and (3) the evidence is material, meaning there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002); *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999).

Favorable evidence is material if there is a reasonable probability that had the evidence been disclosed to the defense, the outcome of the proceeding would have been different. *Ex Parte Kimes*, 872 S.W.2d 700, 703 (Tex. Crim. App. 1993). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Id*. at 702. The mere possibility that undisclosed evidence may have helped the defense or affected the trial's outcome does not establish "materiality" in the constitutional sense. *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002). Whether the evidence is material is viewed in the context of the overall strength of the State's case. *Id*. at 613.

When, as in the present case, the alleged *Brady* material is discovered during trial, the inquiry is whether the defendant is prejudiced by the late disclosure. *Olivarez v. State*, 171 S.W.3d 283, 290 (Tex. App.—Houston [14th Dist.] 2005, no pet.). If the defendant receives the material in time to put it to effective use at trial, his conviction should not be reversed simply because it was not disclosed as early as it might or should have been. *See id.*; *see also Khoshayand v. State*, 179 S.W.3d 779, 783 (Tex. App.—Dallas 2005, no pet.); *Valdez v. State*, No. 05–09–01093–CR, 2010 WL 2636149, at *4 (Tex. App.—Dallas July 2, 2010, pet. dism'd) (not designated for publication).

The record shows Malesky testified on direct examination that she originally told the police that the $500, her purse, and the other items were missing from the apartment, but that she later found her purse and the other items in her bedroom closet. She testified on cross-examination that she called Detective Quirk and told him she had found the items that she originally thought were missing. She could not recall precisely when this call took place, but estimated it would have been around the 29th or 30th of October. On the following day, prior to the start of testimony, defense counsel moved for a mistrial based on having learned for the first time when Malesky was on the witness stand that her purse, medication, and the other items were

recovered. He argued that this was *Brady* material that could have been used for impeachment, and that it would have been crucial in trial preparation, the voir dire of jurors, and in arguing for a lesser-included offense of murder if it could be proved that appellant "didn't steal anything." Detective Quirk subsequently testified on cross-examination that there was nothing in his notes indicating he was contacted by Malesky regarding the recovery of the missing property. Defense counsel asked, "Let me ask you, as far as the information in this case regarding the purse, the drugs, the money, $500, were you ever contacted by Ms. Malesky indicating that that property had been found?" He replied, "Not that I recall. I have no notes on that." The detective also testified that the first time he learned the missing property had been found was "about a month ago during trial preparation meeting with the DA," and that was "the first time I heard that she found her purse, she found her money and prescriptions."

The State acknowledges in its brief that "the record is clear that the information regarding the erroneous nature of Malesky's initial claims should have been provided to [a]ppellant's defense team more promptly." During the discussion with the trial court that accompanied the motion for mistrial, the prosecutor told the court that they mistakenly believed they had provided the defense with copies of everything in their possession as part of their "open file" policy. Nevertheless, the State argues the record shows appellant's defense team received the information in sufficient time to put it to effective use at trial. We agree. The record reflects that defense counsel was able to use Malesky's admission regarding the recovery of the missing items during his cross-examination, pointing out she "went through" several meetings with detectives while maintaining that the items were missing, and that if she was mistaken about those missing items there might be other things about which Malesky was mistaken. In its closing argument, the defense cited not only the information from Malesky regarding how she had been wrong in claiming the aforementioned items were missing from the apartment, but also

the way in which that information had been tardily provided to the defense:

> Look, we start this case out and I find out the day of trial, the day of trial when we are in here with a witness on the stand, that $500 wasn't stolen, that a purse wasn't stolen, that rings weren't stolen. And you know that I found out that day because I asked the detective, and the detective finds out a month or two before trial and doesn't go back and investigate. He gets a GSR [gunshot residue] report that comes back for somebody else and doesn't go out and investigate.

Later, when defense counsel resumed his argument after the State objected that there was no evidence to support counsel's suggestion that Hellner may have had "a buddy" with him in his room that night, "at least one, maybe two," defense counsel stated:

> And I am glad he objected to that because I'm going to show you some pictures that might show it differently. So you keep that in mind. You keep in mind what they are trying to keep you from hearing and keep you from seeing by giving things late. That's what you need to keep in mind here.

We conclude appellant received notice of the information regarding the recovered items in time to make effective use of it at trial. Accordingly, appellant has failed to show he was prejudiced by any tardy disclosure of the above-mentioned information, and the trial court did not abuse its discretion by denying the request for a mistrial. *See Wilson v. State*, 7 S.W.3d 136, 146 (Tex. Crim. App. 1999) (defendant bears burden of showing prejudice from tardy disclosure). Our finding that appellant has failed to show he was prejudiced is buttressed by the fact that there is no indication in the record he sought a continuance upon learning Malesky had changed her story. *See State v. Fury*, 186 S.W.3d 67, 73–74 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (defendant's failure to ask for continuance upon disclosure of *Brady* material at trial is a situation in which the defendant either waived any *Brady* error or essentially conceded that any *Brady* error did not prejudice him); *see also State v. DeLeon*, 971 S.W.2d 701, 706 (Tex. App.—Amarillo 1998, pet. ref'd); *Brindle v. State*, No. 05–10–01258–CR, 2012 WL 1150533, at *3 (Tex. App.—Dallas Apr. 9, 2012, no pet.) (mem. op., not designated for publication).

As for the trial court's failure to provide a curative instruction, defense counsel told the

trial court he was alternatively asking for a curative instruction because the prosecutor who conducted the voir dire told the panel that the State had an "open file" policy under which the prosecutor "has to open his file." That prosecutor explained the policy this way: "Everything in our file that is not work product—and what I mean by work product is our notes on preparing for trial—the Defense attorneys have a copy of it. Any statements, any police reports, any DNA reports, anything like that have been turned over to the Defense." The trial court ultimately denied appellant's request for a curative instruction. Appellant argues that the State's comments during voir dire "left a false impression of the real state of the facts about disclosure with the jury," and that appellant's right to a fair trial was thereby prejudiced.

Appellant, however, never specified what kind of curative instruction he wanted the trial court to give. Defense counsel asked "for an attempted curative instruction to the jury" that Malesky's story had not been provided to appellant's defense team until the day she testified, despite what the State's prosecutor said in voir dire, but the jury was well aware that Malesky had changed her story regarding the missing property, and that defense counsel did not learn Malesky's story had changed until the day of trial. Given that the defense provided no other indication of what kind of instruction it expected the trial court to provide, we conclude that no abuse of discretion has been shown. We overrule appellant's second and third issues.

### *Fourth Issue*

In his fourth issue, appellant contends the trial court erred by denying appellant's request for a mistrial "concerning highly relevant information not being turned over to the defense prior to trial." At issue are the fingernail clippings taken from Hellner that were not tested for DNA until the later stages of the trial—DNA tests that showed Hellner had biological material under the fingernails of his right hand that did not belong to appellant or Malesky.

Appellant contends the trial court's refusal to grant a mistrial constituted reversible error

because highly relevant information was not turned over to the defense prior to trial. The record, however, shows that the failure to have the DNA results from the fingernail clippings available sooner was attributable to appellant's defense team. As we stated in our previous opinion:

> It is undisputed that the State had furnished defense counsel the autopsy report months before trial, that the report clearly referred to the fingernail clippings taken from the decedent, and that defense counsel completely overlooked the report's reference to the fingernail clippings. Counsel advised the court he was shocked when the medical examiner testified about the fingernail clippings.

*Wilkins*, 2014 WL 465820, at *5. We also stated:

> [Appellant] characterizes the DNA test results conducted on the fingernail clippings as the newly discovered evidence and argues the test results were unknown to him at the time of trial. At trial, however, it is clear that counsel was alarmed only after realizing that the autopsy reported the collection of fingernail clippings, a fact counsel admitted overlooking, and that no DNA testing had been conducted. In other words, the evidence which was newly discovered by counsel was the fingernail clippings. Counsel's oversight, however, does not render the originally discovered evidence, the fingernail clippings, or the subsequently developed evidence, the DNA test results, "newly discovered evidence" simply because counsel belatedly realized the existence of the fingernail clippings and the potential significance of DNA testing. The autopsy report and the information regarding the fingernail clippings were in defense counsel's possession for months. Such possession imputes counsel with knowledge of the contents of the document. Otherwise, disclosure by the State could be easily undercut by counsel's failure to examine a document. Nor may [appellant] advance a claim of "newly discovered evidence" by arguing, as he does, that the DNA test results conducted on the fingernail clippings were unknown to him at the time of trial. The DNA test results were unknown to [appellant] but only because counsel failed to take advantage of the material disclosed and failed to request such testing prior to trial. What [appellant] ignores is that the DNA testing process was known and available at the time of trial. [Appellant] simply failed to utilize it. The [appellant] is responsible for his own lack of knowledge and the unavailability of the test results. [Appellant] had the opportunity to request DNA testing after receiving the autopsy report. He had a second opportunity when the State offered exhibit 108, the actual clippings, into evidence at the outset of the trial because exhibit 108 again placed him on notice of the fingernail clippings. But in each instance, counsel took no action. We, therefore, find no merit in [appellant's] argument that the DNA test results should be characterized as newly discovered evidence unknown to [appellant].

*Id*.

"A *Brady* violation occurs when the state suppresses, willfully or inadvertently, evidence

–16–

favorable to appellant." *Harm v. State*, 183 S.W.3d 403, 407 (Tex. Crim. App. 1986). It is axiomatic that there can be no *Brady* violation without the suppression of favorable evidence. *Id*. As we explained in our previous opinion, the record here shows that appellant's defense team was provided with a copy of the autopsy report almost six months before the trial started, that the autopsy report clearly referred to the fingernail clippings taken from Hellner, and that defense counsel simply overlooked the report's reference to the fingernail clippings. Given the record in this case, the trial court did not abuse its discretion by denying appellant's request for a mistrial.

### Fifth and Sixth Issues

In his fifth and sixth issues, appellant argues the trial court erred by refusing to declare a mistrial based on the State's having introduced hearsay into evidence, and by refusing to declare a mistrial when the State elicited hearsay testimony from a detective. These issues concern testimony from Detective Vick and Detective Quirk.

Appellant first calls our attention to a portion of Detective Vick's testimony where he was asked about State's exhibit 73, which is a photograph of the bathroom inside the apartment where Hellner's body was found. The relevant portion of the record reads as follows:

Q. What do we see in State's 73?

A. Just a picture of the bathroom and the area where she said she retrieved the knife from.

Q. Did you check this bathroom door for latents, as well?

[DEFENSE COUNSEL:] I'm sorry, Your Honor, I'm going to object again to anything she said. Clearly it's hearsay.

THE COURT: Sustained.

[DEFENSE COUNSEL:] Respectfully request that the jury disregard.

THE COURT: The jury will be instructed to disregard the last answer from the witness.

[DEFENSE COUNSEL:] Respectfully request a mistrial, Your Honor.

–17–

THE COURT:  Overruled.

Appellant next directs our attention to a portion of Detective Quirk's testimony where he was discussing the interview with appellant.  The detective testified that appellant changed his story about an hour and a half into the interview, admitting he had a gun that night and that he later sold it.  The record then reads as follows:

Q.  During that interview we see you on your cell phone for a little bit; is that right?

A.  Yes.  I am on the phone with other detectives actually trying to find that house.  And we found a house, we were unable to develop any leads from the gun that way.

Q.  Doesn't he get specific about where that house is, sir?

A.  He does.

Q.  He gives you in some relation to, I think it's Lincoln.

A.  Lincoln High School, a particular corner, Hispanic family living there, those kinds of details he did give me, yes.

Q.  So he does give up some details saying, I sold the house [sic] to this house, to this family, and that's on the video, right?

A.  Yes.

Q.  Did you investigate that further, sir?

A.  We did—I did.

Q.  Did his information turn out to be correct?

A.  No.

Q.  You were able to make contact with the family that lives in that house?

A.  Yes.

Q.  And had they received any gun from the defendant?

A.  They did not know him.

[DEFENSE COUNSEL:]  Your Honor, I am going to object.  That is based upon hearsay.

–18–

THE COURT:  Sustained.

[DEFENSE COUNSEL:]  I ask that the jury be instructed to disregard.

THE COURT:  The jury will disregard the last answer and question.

[DEFENSE COUNSEL:]  And respectfully request a mistrial.

THE COURT:  Overruled.

The trial court sustained appellant's hearsay objections and promptly instructed the jury to disregard the complained-of testimony.  Such instructions are ordinarily considered sufficient to cure error associated with an improper question and answer.  *See Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003) ("We have held that 'ordinarily, a prompt instruction to disregard will cure error associated with an improper question and answer.'") (quoting *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000)); *Martinez v. State*, 17 S.W.3d 677, 691 (Tex. Crim. App. 2000) ("Even when the prosecutor mentions facts outside the record during argument, an instruction to disregard will generally cure the error.").  This case is no different. The testimony in question—that Malesky retrieved the knife from the bathroom and that the family that lived in the house where appellant indicated he sold the gun did not know him—did not constitute the sort of indelible, prejudicial evidence that normally warrants the granting of a mistrial.  *See Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000) (improper statement must be "of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors").  Based on the record in this case, we conclude that any possible harm caused by the testimony in question was cured by the trial court's prompt instructions to disregard, and that the trial court did not err by denying the motions for mistrial. We overrule appellant's fifth and sixth issues.

### Seventh Issue

In his seventh issue, appellant contends the trial court erred by denying his motion for mistrial following an attempt by the State to elicit testimony from Detective Quirk regarding

–19–

whether appellant was telling the truth.

The record shows that after Detective Quirk testified regarding his law enforcement background, how he became involved in this case, and his experience interviewing suspects, the State introduced the videotape of appellant's interrogation, State's exhibit 96. The video was then played for the jury, but problems with the audio prompted the State to pause and ask for a delay of several minutes. While those audio problems were attended to, the prosecutor continued his examination of Detective Quirk. Eventually, the State asked him, "From what you know, throughout the course of the investigation is this defendant telling the truth throughout his confession?" Before the detective could answer the question, defense counsel objected and asked to approach the bench, at which point the trial court excused the jury. After the jury left the courtroom, defense counsel objected to what he called a "highly improper, highly prejudicial" question, arguing it violated appellant's Fifth Amendment and due process rights and that appellant had been prejudiced "beyond any curative instructions the Court could do." The trial court assured defense counsel that when the jury returned it would instruct them to disregard the last question asked by the State, and it ultimately sustained the objection. The video was played when the jury returned, but further technical difficulties prompted the State to ask for another delay while the problems were addressed. Following a lunch recess, the court briefly turned its attention to a juror who testified that she could no longer go on with the trial due to the death of a family friend. After that juror was excused, and while the jury was still out of the courtroom, defense counsel reminded the court of his earlier objection and the court's promise to instruct the jury to disregard the prosecutor's last question. When the jurors were brought in, the trial court instructed them as follows:

> Good afternoon. I want y'all to know that, due to some difficulties in her personal life, we have released one of the jurors. So you 12 are now the jury in this case.

> And before we proceed I want to also remind you that right before we saw the

video, back when the attorneys were having some technical difficulties, the detective was on the stand, a question was asked of him, Defense objected, and then we stopped at that time. I have sustained that objection and I am instructing you at this time to disregard and not consider for any purpose the question that was asked at that time.

The defense also moved for a mistrial, which was denied.

Although nearly four hours passed between appellant's initial objection and the instruction to disregard,[2] it is worth remembering that the question to which defense counsel objected went unanswered. We presume the jury followed the trial court's instruction. *See Wesbrook v. State*, 29 S.W.3d 103, 116, (Tex. Crim. App. 2000). Furthermore, the asking of an improper question seldom calls for a mistrial, because, in most cases, any harm can be cured by an instruction to disregard. *Ladd*, 3 S.W.3d at 567; *see also Russeau v. State*, 171 S.W.3d 871, 885 (Tex. Crim. App. 2005). A mistrial is required only when the improper question is clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors. *Ladd*, 3 S.W.3d at 567. This is not such a case. Accordingly, we conclude that any error in this instance was cured by the trial court's instruction to disregard, and that the trial court did not abuse its discretion by denying the motion for mistrial. We overrule appellant's seventh issue.

### Ninth Issue

In his ninth issue, appellant argues the trial court erred by failing to grant a motion for mistrial "when a person in the audience caused a disturbance that prejudiced [a]ppellant's right to a fair trial."

At issue is a disturbance in the courtroom caused by a bystander when LaShanda Nwachukwu, appellant's sister, was on the stand. The State asked Nwachukwu how she felt

---

[2] According to the reporter's record, the initial objection was lodged at 10:37 a.m., and the jury was brought into the courtroom to hear the instruction to disregard at 2:27 p.m.

when she learned her brother had been charged with murder. She replied, "Bad." The State then asked: "You felt bad? Did you feel surprised? I see you shaking your head from side to side. Does that mean no?" At that point, defense counsel asked to approach the bench. The court excused the jury and counsel made the following objection:

> Judge, the prosecution was asking what I would believe to be a rather important question of this witness as to whether or not she was surprised. The prosecution then made a statement that she was shaking her head and asked if that meant no.
>
> The witness was—had not answered yet, was in the process of answering, at which point an individual on the front row in the jury [sic] stood up in hysterics, rushed out of the courtroom making a big commotion. I believe that is highly prejudicial especially at the point at which that was, especially basically the implication to the question is you are not surprised because he committed capital murder, which was definitely the implication of the question and she gets up and makes that motion.
>
> I respectfully request a mistrial at this point based upon the actions of the family member of the decedent, or whoever it was that was sitting over there. I do not think that there is anything that can cure that in the minds of these jurors based upon when that happened and the question that was on the table.
>
> THE COURT: I will hold my ruling for now.
>
> (Pause in proceedings.)
>
> THE COURT: On the record.
>
> I have considered the Defense motion for mistrial and I am going to deny that motion at this time.
>
> [DEFENSE COUNSEL:] Thank you, Your Honor. We would then request a curative instruction to the jury that they are to disregard any comments, statements or emotions from the gallery and not to consider that in any way, shape or form in the jury's deliberations.
>
> THE COURT: I will grant that.

When the jury was brought back to the courtroom, the trial court instructed it as follows: "Before we continue I am going to instruct the jury to disregard any comments or statements or displays of emotion that were shown in the courtroom before we took our break and not consider such for any purpose whatsoever in this trial."

The Texas Court of Criminal Appeals has "long held conduct by a bystander 'which interferes with the normal proceedings of a trial will not result in reversible error unless the defendant shows a reasonable probability that the conduct interfered with the jury's verdict.'" *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) (quoting *Landry v. State*, 706 S.W.3d 105, 112 (Tex. Crim. App. 1985)). "Instructions to the jury are generally considered sufficient to cure improprieties that occur during trial." *Id.* "And we generally presume that a jury will follow the judge's instructions" *Id.*

The record in this case does not illustrate precisely what kind of disturbance occurred in the courtroom, but it appears to have been brief in nature, and the jury was quickly excused. Based on counsel's description, i.e., that the bystander "stood up in hysterics" and "rushed out of the courtroom making a big commotion," it does not appear the bystander made any discernable statements. In any event, nothing in this record suggests the disturbance was of such a nature that the jury could not follow the trial court's instruction. *See id.* (capital murder defendant not entitled to mistrial based on outburst by member of victim's family that shouted "[y]ou did this for 200 dollars?" during testimony of prosecution witness); *Brown v. State*, 92 S.W.3d 655, 661 (Tex. App.—Dallas 2002) (victim's father's outburst of "[g]ive my son justice, please" during murder trial cured by trial court's instructions to disregard comment), *aff'd on other grounds*, 122 S.W.3d 794 (Tex. Crim. App. 2003). The trial court did not abuse its discretion by denying appellant's motion for mistrial. We overrule appellant's ninth issue.

### Twelfth Issue

In his twelfth issue, appellant argues the trial court erred by denying appellant's motion for mistrial "when one of the State's prosecutor's gave a personal opinion about his co-counsel putting [appellant's] sister on the witness stand."

Appellant's complaint is based on a comment made by the prosecutor during the State's

closing argument.  The relevant portion of the record reads as follows:

> I don't know many people that go commit a heinous, intentional capital murder and call 911 within 13 minutes of doing it, because that's what they want you to believe is that she went and killed the guy she's known for five years and been living with and then calls 911 within 13 minutes.  That's the story they are trying to sell you.  You buy off on it?  I can't.  Again, it's your decision.  But they are trying to say that this woman, who had no beef whatsoever with the guy she is living with, who is her partner in her drug trade business, who she considered her daddy, she is going to go shoot two times and then call 911.  Then—and this is why my co-counsel—and I think he did a great job putting the defendant's sister on the stand—

> [DEFENSE CO-COUNSEL:]  I'm going to object to his characterization of how his co-counsel did anything, Your Honor.

> THE COURT:  Sustained.

> [DEFENSE CO-COUNSEL:]  It's not proper argument.  Ask the jury be instructed to disregard that statement of this prosecutor.

> THE COURT:  The jury will be instructed to disregard the last statement of the prosecutor.  And you have one minute.

> [DEFENSE CO-COUNSEL:] And because of the prejudicial nature, we must move for a mistrial.

> THE COURT:  Motion is overruled.

The State concedes that the prosecutor's comment that his co-counsel "did a great job putting the defendant's sister on the stand" does not fall within any of the four "normal" categories of proper jury argument.  *See, e.g., Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011) (proper jury argument must generally fall within one of four categories:  (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) responses to argument of opposing counsel; and (4) pleas for law enforcement).  But even when an argument exceeds the permissible bounds of generally accepted jury argument, it is not reversible unless the argument is extreme or manifestly improper, violates a mandatory statute, or injects into the trial new facts harmful to the accused.  *Wesbrook*, 29 S.W.3d at 115.  The remarks must have been a willful and calculated effort on the part of the State to deprive appellant of a fair and

–24–

impartial trial. *Id*. Instructions to the jury will generally cure most improprieties that occur during a trial, and we presume that a jury will follow the trial court's instructions. *Gamboa*, 296 S.W.3d at 580. Mistrial is an appropriate remedy only in extreme circumstances and is reserved for a narrow class of highly prejudicial and incurable errors. *Hawkins*, 135 S.W.3d at 77. If the harm caused by an improper jury argument is incurable, a motion for mistrial preserves error for appellate review. *Cruz v. State*, 225 S.W.3d 546, 548 (Tex. Crim. App. 2007); *Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim. App. 2004). In determining whether improper jury argument warrants a mistrial, we balance three factors: (1) severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); (2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the court); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Hawkins*, 135 S.W.3d at 77; *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g).

When, as in this case, the trial court sustains the objection and instructs the jury to disregard but denies the defendant's motion for a mistrial, the issue is whether the trial court erred by denying the mistrial. *Faulkner v. State*, 940 S.W.2d 308, 312 (Tex. App.—Fort Worth 1997, pet. ref'd) (op. on reh'g). Applying the above factors, the State concedes the prosecutor's comment does not fall within any of the "normal" areas of proper jury argument. But although improper, the prosecutor's comment was brief, it did not inject any new facts into the record, and the jury was in a position to evaluate the truthfulness of the prosecutor's statement that his co-counsel did "a great job putting the defendant's sister on the stand." Given the nature of the prosecutor's comment, we conclude that this first factor does not weigh heavily in appellant's favor. *See Mosley*, 983 S.W.2d at 260. As for the second factor, the trial court sustained the objection and instructed the jury to disregard the prosecutor's comment. The court's instruction cured any error caused by the comment, which was isolated and not repeated. *See Gamboa*, 296

–25–

S.W.3d at 580. Turning to the final factor, the prosecutor did not inject any new or harmful facts into the trial, did not violate a mandatory statute, and the jury was presented with considerable evidence of appellant's guilt. *See Mosley*, 983 S.W.2d at 260. Balancing the relevant factors, we conclude the prosecutor's comment did not render ineffective the instruction to disregard, and that the trial court did not abuse its discretion by denying the motion for mistrial. We overrule appellant's twelfth issue.

### III. Evidentiary Issues

#### *Eighth Issue*

In his eighth issue, appellant contends the trial court erred by overruling appellant's objection to the 911 manager for the City of Dallas, Kimberly Cole, being allowed to testify concerning a 911 record when she was not the actual 911 operator that received the call, and that appellant's rights to confrontation and cross-examination were thereby violated.

The operator who took the October 26, 2010 911 call, Velma Finn, was unavailable to testify at trial because she had suffered a stroke about a year before trial, followed by a series of strokes since then. The State called Kimberly Cole, the 911 manager for the City of Dallas, and during her testimony it established a business records predicate for the admission of the 911 record, State's exhibit 115. *See* TEX. R. EVID. 803(6). State's exhibit 115 was an "Incident Detail Report" that reflected the placement of the 911 call that reported Hellner had been shot. The report contains various information including the address and apartment number, the caller's first name, the time of the call, and the "call back" telephone number of the 911 call. Cole testified that she was the custodian of records for State's exhibit 115, that State's exhibit 115 was a business record that was prepared by 911 during the course of business, and that the entries in State's exhibit 115 would have been made at or near the time of the offense. Cole also testified that the system was designed to automatically generate, or as she put it "auto-populate," the

phone number of the 911 call once a call had been placed, but sometimes the system would slow down and the 911 operators could manually input the information on the report as they heard it over the telephone. The recording of Malesky's 911 call, State's exhibit 95, which had already been admitted and played for the jury, showed her giving the 911 operator her address and telephone number. The defense thus argued it was being denied the right of confrontation as to whether the phone number of the 911 call was automatically entered by the computer or manually entered by the 911 operator based on information supplied to her by Malesky.

We review a trial court's decision regarding the admissibility of evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). A trial court abuses its discretion when its decision lies "outside the zone of reasonable disagreement." *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007).

Appellant's argument is that his Sixth Amendment right to confront and cross-examine the witnesses against him was violated. The Confrontation Clause of the Sixth Amendment provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. *Langham v. State*, 305 S.W.3d 568, 575 (Tex. Crim. App. 2010); *see also* U.S. CONST. AMEND. VI. The threshold inquiry for any supposed Confrontation Clause violation is whether the admitted statement is testimonial or nontestimonial in nature. *Vinson v. State*, 252 S.W.3d 336, 338 (Tex. Crim. App .2008); *Lollis v. State*, 232 S.W.3d 803, 805–06 (Tex. App.—Texarkana 2007, pet. ref'd). Whether a statement is testimonial or nontestimonial is a question of law we review de novo. *Langham*, 305 S.W.3d at 576; *see also Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006). Statements are testimonial if "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006). Statements are nontestimonial when made during an interrogation whose objective primary purpose was to

enable the police to respond to an ongoing emergency. *Michigan v. Bryant*, 562 U.S. 344, 356 (2011); *Davis*, 547 U.S. at 822; *State v. Echendu*, No. 05–11–00346–CR, 2012 WL 1130419, at *2 (Tex. App.—Dallas Apr. 5, 2012, no pet.) (not designated for publication) (911 telephone call recording admissible under Confrontation Clause because statements to 911 operator were nontestimonial).

"Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009); *Sessums v. State*, No. 06–14–00017–CR, 2014 WL 5421023, at *7 (Tex. App.—Texarkana Oct. 24, 2014, pet. ref'd) (mem. op., not designated for publication). However, a business or public record may nonetheless be inadmissible if it is prepared for prosecutorial use or in anticipation it will be used for prosecutorial purposes. *Sessums*, 2014 WL 5421023, at *7 (citing *Melendez–Diaz*, 557 U.S. at 324). In such a situation, the business or public record is considered testimonial and subject to a Confrontation Clause challenge. *Id.* The intended or anticipated use of the statement determines whether it is testimonial. *Grey v. State*, 299 S.W.3d 902, 909 (Tex. App.—Austin 2009, pet ref'd) (citing *Davis*, 547 U.S. at 813).

In this case, we find no violation of appellant's confrontation rights stemming from the admission of the 911 "Incident Detail Report." Regardless of whether the telephone number and other information on the report was "auto-populated" or entered manually, it would have been entered during the October 26, 2010 911 call, at a time when the police were responding to a reported shooting victim. That was before the police had had an opportunity to even begin their investigation, much less make any arrests. Detective Vick testified that when he first arrived at the crime scene and began gathering evidence, he had no particular suspects or subjects that he

was looking for. There is simply no indication the 911 report was prepared for prosecutorial use. On the contrary, the report contains the kind of information that would have aided the police in responding to the reported shooting and providing emergency assistance. We conclude the 911 "Incident Detail Report" was nontestimonial in nature and its admission did not violate appellant's right to confront or cross-examine the witnesses against him. We overrule appellant's eighth issue

### *Tenth Issue*

In his tenth issue, appellant argues the trial court erred by refusing to admit a portion of his recorded statement where he expressed a willingness to take a polygraph test.

Texas courts have long held that because polygraph testing is inherently unreliable, the results of polygraph testing are not admissible for any purpose regardless of whether the evidence is offered by the State or the defendant. *See Nethery v. State*, 692 S.W.2d 686, 700 (Tex. Crim. App. 1985). As the Austin Court of Appeals once stated:

> [T]he only reason anyone would take a [polygraph] test is to determine whether the witness is telling the truth. Likewise, the only reason a person would agree to take a polygraph test is to determine whether that person is telling the truth. Neither taking, nor agreeing to take the test, in actuality, determines who is telling the truth. The test is inherently unreliable for this purpose. Its inherent unreliability notwithstanding, the purpose for the test is to determine whether a person is being truthful. Therefore, the only reason one would agree to take, or would actually take, the test is for the purpose of resolving the question of whether that person is telling the truth, whether that can actually be determined or not.

*Sparks v. State*, 820 S.W.2d 924, 928–29 (Tex. App.—Austin 1991, no pet.); *see also Kirk v. State*, 07–97–0389–CR, 1999 WL 158496, at *7 (Tex. App.—Amarillo Mar. 12, 1999, no pet.) (not designated for publication) (citing *Sparks*). Texas courts also hold that when, as in this case, the accused does not take the stand, self-serving statements are not admissible where they are merely contradictory to some act or declaration first proffered by the prosecution. *Hafdahl v. State*, 805 S.W.2d 396, 402 (Tex. Crim. App. 1990), *disavowed on other grounds by Cook v.*

–29–

*State*, 858 S.W.2d 467, 469 (Tex. Crim. App. 1993); *see also Moore v. State*, 849 S.W.2d 350, 351 n.1 (Tex. Crim. App. 1993) (Baird, J., concurring); *Reado v. State*, 690 S.W.2d 15, 17 (Tex. App.—Beaumont 1984, pet. ref'd); *Kirk*, 1999 WL 158496, at *7.

At trial, the defense argued it should be allowed to show appellant was willing to take a polygraph test to rebut the State's argument regarding appellant's flight as a circumstance of guilt:

> [T]he one issue I am talking about is my client agreed to take a polygraph test. And I think that that is very relevant because a time was set up where the investigator was going to come back and take that polygraph test. He never showed. Part of what I will show is that they didn't do a fair and proper investigation in this aspect. Whether he took the polygraph or not, it's the results of a polygraph that aren't admissible. And we're asking that it goes in there because it goes to our client's state of mind that he was willing to cooperate.
>
> They are going to argue flight and that flight shows guilt. Well, we can argue then that his ability and desire to cooperate combats that flight. So we would argue that the fact that he was willing to take a polygraph test, and Quirk had indicated he was going to come back and do one, that that in and of itself should be admissible and the jury should be able to analyze that and review it in regards to all the testimony.

A trial court does not violate a defendant's constitutional rights by excluding inadmissible evidence. *Osby v. State*, 939 S.W.2d 787, 792–93 (Tex. App.—Fort Worth 1997, pet. ref'd) ("It goes without saying that a trial court does not violate a defendant's constitutional rights by excluding inadmissible evidence."). As other courts have noted, the only reason a person would agree to take a polygraph is to prove he is telling the truth—through a means that courts have long held to be inherently unreliable. *See Sparks*, 820 S.W.2d at 928–29; *Kirk*, 1999 WL 158496, at *7. Appellant's expressed willingness to take a polygraph test was, consequently, an out-of-court self-serving declaration offered as proof of his truthfulness, and as the trial court noted, it was clearly inadmissible. We overrule appellant's tenth issue.

### Eleventh Issue

In his eleventh issue, appellant contends the trial court erred by admitting into evidence

recordings of telephone calls that appellant made while he was an inmate at the Dallas County Jail. Before the State offered those recordings into evidence, appellant's co-counsel made the following objection:

> In anticipation of the State offering jail calls, this defendant has been incarcerated in the jail, and it's my understanding that the jail system here records every outgoing phone call from defendants and has this process. Our esoteric argument is that this is actually the same as having planted an agent into a cell with him to record or to get statements from him. So we claim that this is a violation of his due process rights to record his conversations and then play them in court without first having a *Miranda* warning. And it's a violation of 38[.]22.

The trial court overruled the objection. The State later called Scott Seacat, the custodian of records of the inmate phone system for the Dallas County Jail. Seacat testified a prompt notifies inmates and the other party to the call at the beginning of the call that it is being "recorded and/or monitored." The State also called Jeff Savage, an investigator for the Dallas County District Attorney's Office, who testified that he retrieved telephone calls made by appellant at the Dallas County Jail from November 14, 2010 to December 7, 2010. Savage "burned" those calls to a CD and gave them to the prosecutor.

*Miranda* warnings must be given before a suspect's statements made during custodial interrogation may be admitted into evidence. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Estrada v. State*, 313 S.W.3d 274, 293 (Tex. Crim. App. 2010). The Texas Code of Criminal Procedure imposes restrictions on the admissibility of an accused's statements made as a result of custodial interrogation. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2; *see also Wilkerson v. State*, 173 S.W.3d 521, 527 (Tex. Crim. App. 2005). In order for a statement to be the result of "custodial interrogation," however, it must be made in response to interrogation by law enforcement officers or their agents. *State v. Scheineman*, 77 S.W.3d 810, 813 (Tex. 2002); *see Wilkerson*, 173 S.W.3d at 527 (noting that *Miranda* generally applies only to questioning by law enforcement officers or their agents). In this case, appellant made the statements in question

during telephone calls that he placed from the jail where he was incarcerated awaiting trial. Texas courts have long held that statements made under such circumstances are admissible because an accused has no legitimate expectation of privacy, the loss of which is an inherent incident of confinement. *See Scheineman*, 77 S.W.3d at 813 (arrestee had no "legitimate expectation of privacy in conversations between arrestees who are in custody in a county law enforcement building," and recorded statements made during conversation between arrestees were admissible); *Banargent v. State*, 228 S.W.3d 393, 402 (Tex. App.—Houston 14th Dist. 2007, pet. ref'd) (statements made in telephone call by appellant from county jail not the product of custodial interrogation); *Rubio v. State*, 04–13–00436–CR, 2014 WL 1319336, at *1 (Tex. App.—San Antonio Apr. 2, 2014, no pet.) (mem. op., not designated for publication) (telephone calls made from interrogation room of police station not product of custodial interrogation); *Escalona v. State*, No. 05–12–01418–CR, 2014 WL 1022330, at *10 (Tex. App.—Dallas Feb. 20, 2014, pet. ref'd) (mem. op., not designated for publication) (trial court did not abuse its discretion by admitting recordings of two telephone calls appellant made from county jail). The trial court did not abuse its discretion by admitting the complained-of statements. We overrule appellant's eleventh issue.

## IV. Modification of Judgment

The judgment in this case, under "Punishment and Place of Confinement," incorrectly states "LIFE INSTITUTIONAL DIVISION, TDCJ," when the trial court actually imposed a mandatory sentence of life imprisonment without parole. *See* TEX. PENAL CODE ANN. § 12.31(a)(2). Based on the record and the relevant law, we modify the judgment to reflect that appellant was sentenced to life imprisonment without the possibility of parole. *See* TEX. R. APP. P. 43.2(b); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd) (providing that an appellate court has the authority to modify incorrect judgments sua sponte

when the necessary information is available to do so); *see also Tyler v. State*, 137 S.W.3d 261, 267–68 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (authority to modify judgment is not dependent upon a party's request).

As modified, the trial court's judgment is affirmed.


<u>/ Lana Myers/</u>
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
141365F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

TERRANCE GERMAINE WILKINS, Appellant

No. 05-14-01365-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 6, Dallas County, Texas
Trial Court Cause No. F10-62224-X.
Opinion delivered by Justice Myers. Justices Fillmore and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

"Punishment and Place of Confinement: LIFE INSTITUTIONAL DIVISION, TDCJ" should be changed to read "Punishment and Place of Confinement: LIFE WITHOUT PAROLE INSTITUTIONAL DIVISION, TDCJ."

As **REFORMED**, the judgment is **AFFIRMED**. We direct the trial court to prepare a new judgment that reflects this modification.

Judgment entered this 4th day of August, 2015.